179 So. 646

**TAYLOR v. STATE.**

7 Div. 348.

Court of Appeals of Alabama.

Jan. 18, 1938.

Rehearing Stricken March 8, 1938.

Frank B. Embry, of Pell City, for appellant.

A. A. Carmichael, Atty. Gen., and Clarence M. Small and Robt. F. Park, Asst. Attys. Gen., for the State.

RICE, Judge.

One Charles Polk operated—apparently owned—a "swimming pool" some mile or so outside the limits of Pell City. In connection with this swimming pool Polk ran a rather stinking business; the exact nature of which could, perhaps, but be inferred from the evidence. But it is undisputed that he was openly engaged in the illegal sale of whisky.

The general arrangement seems to have been that on one side of the swimming pool was a small hut or cabin, in which were sold sandwiches, and whisky by the drink.

Across this swimming pool, some little distance, and apparently in plain view, were some cabins, which, as could be fairly inferred from the testimony, were used by Polk as the places in which to sell "assignations"—if we may describe what we have in mind in that manner. It being observed that there was testimony that one or more women were "seen about the premises" in such a way that they, inferentially, were "employed there" by Polk; or at least encouraged to "remain about," in order to make the cabins "rent."

However it all was, it clearly appears that the general "layout" was such as to be a stench in the nostrils of a decency loving people.

Appellant, a young man shown by the testimony to be of good reputation—but who was married and without a job—was employed by Polk to work at this "swimming pool." Among his duties was that of selling whisky, over a counter, "by the drink," in the hut or cabin provided for that purpose, on one side this swimming pool.

His testimony is undisputed that he had nothing to do with the "renting" of the cabins on the other side of the swimming pool; or with "renting any women" that may have been so disposed of, there.

Appellant began his duties with Polk on a Thursday night—he being employed to work at nights—and on the following Saturday night the fight arose in which he shot, with a pistol, and killed, one Mack Young.

■ We shall not undertake to give a detailed account of the killing, as shown by the testimony in the bill of exceptions sent up here, but will content ourselves with the following outline of the general situation—it being all that we deem necessary to make clear the reason for the holding we shall announce, to wit:

It appears that on Friday night some trouble had occurred between Charles Polk and Winfred Young, a brother of the deceased—with which trouble appellant was in no way connected—at the time and place of which he was not even present.

On the following Saturday night, Winfred Young, his brother Mack, the deceased, and his brother-in-law, Herbert Tucker, "met up"—at least were present at the same time—in the little hut or cabin where appellant was illegally selling the whisky for Charles Polk. Polk, himself, was present in the said hut or cabin at the time—as was one or more of his sons.

A fight arose—according to the testimony in the bill of exceptions, without a beginning—between Charles Polk and Winfred Young. This fight was in progress near one end of the little counter which divided the little hut or cabin into two parts—a "front" for customers; and a "behind the counter part" in which Polk or his employee, appellant, prepared the drinks and sandwiches served over the counter.

This fight between Polk and Winfred Young was progressing slightly to the rear—i. e., in the portion of the room used for "preparing the drinks" etc.—of this counter.

Mack Young, the deceased, "mounted" the counter, to go from the "front" into the "rear part" of the room; and, just about as he was reaching the floor behind the counter, appellant shot him, and killed him.

The testimony on behalf of the State tended to make out a case of murder; that on behalf of appellant tended to show that he acted in self-defense. The issues involved were strictly for the jury.

Very damaging testimony against appellant was furnished by State's witness Mack Smith, who said he was in the room and saw the whole occurrence.

Appellant's testimony was to the effect that Mack Smith, while in the room, was so drunk that he could not have known what took place. Some of appellant's tes-

timony was even to the effect that Mack Smith was asleep at the time.

■ In rebuttal, the State introduced as a witness one Johnnie Pijo, who testified that he went to the place of the killing with Mack Smith, reaching there only a few moments before the shooting occurred; and that Mack Smith was not drunk at the time. According to Pijo's testimony, Mack Smith could not have been drunk, as appellant claimed.

But the State went further with this witness Pijo: After eliciting from him the testimony that, at the time of the actual killing, he was not present in the hut or cabin where it occurred, did not see it, was, at the time, across the swimming pool, in one of the cabins referred to above, the State was allowed to ask this witness, and to have him answer—all over appellant's timely objection—with exception duly reserved, the question: "Who was there (meaning in the cabin) with you at that time?" His answer, we might observe, was: "A girl I was with there, I don't know who she was."

It was entirely irrelevant to any issue being tried as to "who was with Johnnie Pijo" in the cabin where he was when he failed to witness the shooting of deceased by appellant. In fact, since Johnnie didn't see the shooting, we don't see that it even mattered where he was. And it is clear that the testimony elicited was very damaging to appellant.

It is one thing to hold, as we do, that it was proper to allow testimony as to the general "set up" out there, of Polk's business, which appellant was helping to operate; this on the theory that it is always proper to show the general surroundings where an occurrence under investigation takes place.

■ But this by no means renders it competent to show—as was allowed here—that a witness, while not present, was, at the time, "concealed with a woman," who, the jury might well have inferred, was "rented to him" by Polk, for whom appellant was at the time working.

The defendant (appellant) was on trial for murder; and the issue was a clear-cut one of whether or not appellant was "not guilty" (the killing being admitted) by reason of having acted in self-defense—as that term was defined to the jury. The clear purpose of the testimony described above, as being elicited from Johnnie Pijo,

was not to shed light on the issue being tried, but to prejudice the jury against appellant by an irrelevant matter—odious as this irrelevant item doubtless appeared to the jury.

While the bill of exceptions does not recite that it contains "all the evidence," and we are therefore relieved of the necessity of "passing on" appellant's written requested, and refused, charges, we do not find that this fact alters in any way our duty to declare error, where it appears, in the admission—or rejection—of testimony in the case. Liberty Nat. Life Ins. Co. v. Collier et al., 228 Ala. 3, 154 So.· 118.

Accordingly, the error already having been hereinabove declared, we hold that, on account of same, the judgment must be reversed, and the cause remanded.

Perhaps we should add that, in so far as appellant's motion to quash the indictment is concerned, and the ruling of the court thereon, no error appears. All that needs to be said on that subject has heretofore been said by the Supreme Court in its answer to our "inquiry"—which "answer" will be found embodied in the opinion of this court in the case of Ollie Speer v. State, 27 Ala.App. 579, 177 So. 162.

Reversed and remanded.

SAMFORD, J., dissents.